UNITED STATES of America, Appellee,

v.

Jesse Lee EVANS et al., Appellants.

Nos. 75–1483 to 75–1486.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted March 23, 1976.

Decided Oct. 4, 1976.

806

Chester I. Lewis, Wichita, Kan. (Lennox S. Hinds, New York City, with him on the brief), for appellants.

Bruce E. Miller, Asst. U. S. Atty., Topeka, Kan. (E. Edward Johnson, U. S. Atty., and Monti L. Belot, Asst. U. S. Atty., Topeka, Kan., with him on the brief), for appellee.

Before LEWIS, Chief Judge, SETH, Circuit Judge, and MORRIS, Chief Judge *.

SETH, Circuit Judge.

The appellants were prisoners at the United States Penitentiary at Leavenworth, Kansas, at the time a serious riot occurred in the prison. A guard was killed, and other guards were injured. The disturbance started in the dining area, and there were outbreaks in other areas. It finally centered near cell house A where all the appellants were housed except Alf Hill, Jr.

The case went to trial on July 29th and the jury returned its verdict on September 26th. The defense put about seventy witnesses on the stand.

The appellants were all charged under 18 U.S.C. § 1792, and 18 U.S.C. § 2 with causing a riot at the penitentiary. The appellants other than Bennett were charged also with assault with intent to murder certain guards. The jury found all the appellants guilty on the riot charge. Also, it found Evans guilty of three counts of assault with intent to murder, Hill guilty of two counts of assault with intent to murder, and Jasper one count of assault with a dangerous weapon.

The trial court overruled motions for a new trial and sentenced the appellants.

The record is rather long, consisting of some 6,400 pages, consequently record references are included in the opinion.

* Of the United States District Court for the Eastern District of Oklahoma.

There is clearly sufficient evidence in the record to support the verdict of the jury as to each appellant and as to each count. The brief for appellants is very complete, and it presents the issues as follows:

*Asserted Error Relative to Pretrial Motions:*

Appellants claim the trial court erred by denying the following pretrial motions:

1. Motion to sever appellants' trials.
2. Motion for discovery and inspection.
3. Motion for bill of particulars.
4. Motion to inspect the grand jury transcript.
5. Motion by appellant Bennett to conduct his own defense.
6. Motion by appellant Bennett to have full use of library facilities.
7. Motion to dismiss Count II as unconstitutional.

We find no error in the trial court's rejection of these motions.

1. Appellants cite no cases to support their contention that "the interests of justice would have been more properly served" had severance been granted. It is well settled that the trial court has wide discretion in passing on a motion for severance. *United States v. Beathune,* 527 F.2d 696 (10th Cir.); *United States v. Eaton,* 485 F.2d 102 (10th Cir.). Here, appellants have not shown prejudice from denial of the motion to warrant a finding of abuse. *See United States v. Earley,* 482 F.2d 53 (10th Cir.).

2. Appellants filed an extremely broad discovery motion pursuant to Rule 16, Fed.R.Crim.Proc. (ROA, Vol. 1 at 56–58). Discovery to the extent asked for was denied by the trial court, but all basic material was disclosed. (ROA, Vol. 2 at 344–419). We find no error in the court's supervision of the discovery stage. The scope of discovery under Rule 16 is within the discretion of the trial judge and is not reviewable absent abuse. *United States v. Smaldone,* 484 F.2d 311 (10th Cir.). There was no abuse here.

3. The same is true in regard to the motion for a bill of particulars filed by appellants under Rule 7(f), Fed.R.Crim.P. The grant or denial of the bill is within the trial court's discretion. The court's decision will not be disturbed absent a showing that the accused was denied information which would have more specifically defined the offense charged. *United States v. Hedges,* 458 F.2d 188 (10th Cir.); *United States v. Gleeson,* 411 F.2d 1091 (10th Cir.). Here, appellants' motions (ROA, Vol. 1 at 37–39, 75–78) seek discovery of facts supporting the charges and do not profess confusion in determining the charges themselves. Denial of the motions was not an abuse of discretion.

4. Appellants asked for production of the grand jury testimony, but there was no record made of the proceedings. There is no requirement in this Circuit that grand jury proceedings be recorded, *United States v. Beathune, supra; United States v. Skolek,* 474 F.2d 582 (10th Cir.).

5. Appellant Bennett argues that he was denied the right to act as his own counsel and was forced to accept appointed counsel. In *United States v. Montgomery,* 529 F.2d 1404 (10th Cir.), this court noted that a criminal defendant in federal court has always had a right to self-representation under the provisions of 28 U.S.C. § 1654. But the right of self-representation, like any other right, may be waived by the defendant. It is clear from the record that Bennett waived his right.

At his arraignment, Bennett was represented by Mr. Gary Eldredge. Before arraignment could be completed, Mr. Eldredge withdrew as counsel, and the court appointed Federal Public Defender Munker to represent appellant. (ROA, Vol. 9 at 1–2). During the arraignment proceedings, the following exchange occurred:

"Mr. Bennett: When this Court appointed an attorney that is unacceptable to me. Last week, or whenever I was in here, my affirmative nods that I was able to obtain counsel was disregarded by you. And you appointed counsel to represent me.

"The Court: You now have retained counsel?

"Mr. Bennett: I am able to obtain counsel.

"The Court: You'll have that opportunity to obtain counsel if you choose. But for the mean time, the Public Defender

. . .

"Mr. Bennett: Well, for the meantime nobody is going to defend me. I will proceed. You cannot force an attorney on me . . .

"The Court: . . . Now, what I was going to say and will say is that Mr. Munker will continue to serve as standby counsel. You may appeal to him for anything that you want, ask him any questions you want, if you choose to do it. You need not do it.

"Mr. Bennett: You mean, your honor, that you are forcing a counsel on me? When I have informed you that I have

. . .

"The Court: No, I have told you what I mean . . . If you want to ask Mr. Munker any questions, he is here for it. *I will grant you two weeks after the arraignment here within which counsel, you may retain them or as your co-defendants have said, the committee retain them, will have two weeks within which to file any motions or do anything of that sort . . . .*" (ROA, Vol. 9 at 4–6) (Emphasis added.)

This conversation took place on March 13, 1974. Approximately two months later, at the pretrial conference, Bennett had not retained counsel and the issue was again addressed:

"Mr. Bennett: If I have to go to trial, I would like to proceed pro se . . .

"The Court: Well, I don't intend to have you go to trial without counsel. You will have counsel, whether you like it or not.

"Mr. Bennett: Well, I can't stop the Court from appointing whoever you want to.

"The Court: What I'm getting at here: There's been some conversation about each of you having an attorney from the National Conference of Black Lawyers. Are you trying to get an attorney from that source?

"Mr. Bennett: I'm not trying to do anything, until I get out of Leavenworth, your Honor.

. . . . .

"Mr. Bennett: I will defend myself. I will proceed pro se at my trial.

"The Court: And, at that time you're going to have a lawyer. I don't mind you appearing partially, but we would have chaos if we permitted everybody to appear pro se." (ROA, Vol. 11 at 30–31). The court was still disturbed by appellant Bennett's vacillation on the counsel issue and took the matter under advisement at the close of the pretrial conference. (ROA, Vol. 11 at 60–61).

At the hearing on pretrial motions on July 15, 1974, Bennett was represented by Mr. Munker of the Federal Public Defenders Office and Mr. Lewis. (ROA, Vol. 12 at 3). Mr. Lewis conducted the legal argument for Bennett without any objection from him. (ROA, Vol. 12 at 7 et seq.). During the motions argument, the following exchange occurred:

"Mr. Lewis: . . . [Mr. Bennett] does have a desire to act as co-counsel in this case . . . and we, therefore have asked the court for a written order permitting him to act as co-counsel in this case.

"The Court: . . . I have no objection, as I think I've voiced to you before, of Mr. Bennett participating in the trial, if he observes the amenities that go with the judicial process, and if he refrains from wild and irresponsible statements. If he were allowed to make an opening statement . . . He also, perhaps, might be able to question a few witnesses, but he does have competent counsel, and I would expect him to listen to his counsel as to what the areas are. *But, I have no objection to him assisting in the defense of his case. And participating in it, as long as he understands the legal ground rules.*

"Mr. Lewis: He does." (ROA, Vol. 12 at 185–186) (Emphasis added).

Thereupon, appellant Bennett began to participate in the legal argument before the court. (ROA, Vol. 12 at 186 et seq.). However, he became disenchanted with certain rulings of the court, and, with the other defendants, disrupted the proceedings. *Id.* at 243–245. As he was escorted from the court room, Bennett stated: "Don't call me back in your courtroom no more." (ROA, Vol. 12 at 245). On July 29, 1974, at the continuation of the motions hearing, Bennett again was present and represented by Mr. Lewis and Mr. Munker. (ROA, Vol. 15 at 2). Bennett immediately asked to be removed from the court room:

"Mr. Bennett: I would request at this time that you allow me to be removed from the courtroom. I do not want to be here . . . I do not wish to dignify what I consider to be a railroad proceeding by sitting here with my presence.

. . . . .

"The Court: If that is where you want to go, Mr. Bennett, you are certainly welcome to go.

"Mr. Bennett: Thank you.

. . . . .

"The Court: Tell me a little bit more, Mr. Bennett; is this going to be your attitude tomorrow?

"Mr. Bennett: I don't know what my attitude will be tomorrow.

"The Court: All right, well, of course, under the rules, any time you want to come back, all you have to do is tell the marshal.

"Mr. Bennett: I know what the rules are.

"The Court: The matter is for your benefit. You have the right to confront the witnesses, and you also have the right to kick your constitutional rights . .

"Mr. Bennett: I don't have any rights in this courtroom.

"The Court: Very well, we've heard you . . .

"(The defendant Odell Bennett is escorted from the courtroom)." (ROA, Vol. 15 at 8–9).

The following day, Bennett appeared with counsel and again requested to leave the court room. (ROA, Vol. 16 at 264–269). Thereafter, Bennett appeared in the court room only for the jury verdict and sentencing.

It is clear from this recitation that Bennett was afforded the opportunity to participate in his defense. Yet it is also clear that he waived his right of self-representation by his behavior. There is no error on this matter.

■ 6. The argument relative to the use of the library is also without merit. Appellants were not denied total access to library facilities but were restricted to use in accordance with prison regulations. This issue is sufficiently covered by this court's decision in *Elkanich v. Alexander,* 315 F.Supp. 659 (D.Kan.), *aff'd* per curiam, 430 F.2d 1178 (10th Cir.), and need not be reiterated.

■ 7. Appellants' final challenge at pretrial was to the constitutionality of 18 U.S.C. § 1792 which prohibits inciting a riot in a federal penitentiary. They argue that the statute is unconstitutionally vague. This court in *Nelson v. United States,* 208 F.2d 211 (10th Cir.), stated:

" . . . Clearly, that statute [18 U.S.C. § 1792] makes it unlawful for any person to instigate, connive or wilfully attempt to cause a mutiny or riot at any Federal penal or correctional institution." 208 F.2d at 212.

This statement is sufficient precedent on the vagueness contention. It is true that circuits differ in construing the statute. *Compare United States v. Rodgers,* 419 F.2d 1315 (10th Cir.), *with United States v. Farries,* 459 F.2d 1057 (3d Cir.). But there is no legal support for appellants' contention that this renders the statute unconstitutionally vague.

*Issues Related to The Petit Jury:*

Appellants' second group of arguments relates to matters concerning the petit jury.

Those arguments can be summarized as follows:

1. Challenge to the array of the petit jury as resulting in the exclusion of minorities.
2. Claimed error for refusing to allow appellants' counsel to conduct an *in camera* individual voir dire examination of the petit jury panel.
3. Claimed error in the court's refusal to allow the jury to take notes and to ask questions during trial.

We find no error in the court's action on these issues.

1. Appellants present alternative arguments in contending the trial court erred by selecting the petit jury from a list of *actual* voters in the last election. They contend that since certain minorities vote in proportionally small numbers, the use of a list of actual voters prevents a fair cross section of the community from serving on the jury. They alternatively argue that the court was in error by not supplementing the voter list with other sources. These points have no merit.

The petit jury selection process used in the District of Kansas was recently held valid by this court. *See United States v. Bennett,* Tenth Circuit, 539 F.2d 45, filed June 28, 1976. Moreover, the circuits are in complete agreement that not only is the use of actual voter lists proper, but that neither the Act nor the Constitution require that a supplemental source of names be added to voter lists simply because an identifiable group votes in a proportion lower than the rest of the population. *See United States v. Freeman,* 514 F.2d 171 (8th Cir.); *United States v. Lewis,* 472 F.2d 252 (3d Cir.); *United States v. Guzman,* 468 F.2d 1245 (2d Cir.), *cert. denied,* 410 U.S. 937, 93 S.Ct. 1397, 35 L.Ed.2d 602; *United States v. Ross,* 468 F.2d 1213 (9th Cir.), *cert. denied,* 410 U.S. 989, 93 S.Ct. 1500, 36 L.Ed.2d 188; *Camp v. United States,* 413 F.2d 419 (5th Cir.), *cert. denied,* 396 U.S. 968, 90 S.Ct. 451, 24 L.Ed.2d 434.

2. In relation to the voir dire procedure appellants again present a two-pronged attack. They first contend that the court erred by refusing to allow appellants' counsel to examine the panel members individually. Alternatively, they argue that the court erred by refusing to ask certain questions of the panel members.

The voir dire of the jury took approximately three days and comprises approximately 600 pages of transcript. The court allowed defense counsel extensive participation in the process. (ROA, Vol. 17 at 437 et seq.; Vol. 18; Vol. 19 concluding at 996). Appellants argue only that panel members should have been examined individually, and certain questions were erroneously excluded by the trial court.

It is well recognized that the method of voir dire examination is within the discretion of the trial judge and will not be disturbed absent abuse. *Lowther v. United States,* 455 F.2d 657 (10th Cir.). The individual examination of potential jurors is appropriate in instances of exposure to potentially prejudicial pretrial and during trial publicity. *United States v. Starks,* 515 F.2d 112 (3d Cir.); *United States v. Addonizio,* 451 F.2d 49 (3d Cir.); *United States v. Colabella,* 448 F.2d 1299 (2d Cir.); *Silverthorne v. United States,* 400 F.2d 627 (9th Cir.).

But here appellants cite no specific instance of prejudicial publicity and rely only on the conclusory statement:

"[T]here was considerable pre-trial publicity since Leavenworth Penitentiary is a famous and well known institution within the State of Kansas. Also, the July 31st rebellion was the first of its kind at Leavenworth, and was widely and continually reported. Also, the murder of guard Selle was extensively reported." Appellants' Brief at 46.

There is no allegation that any publicity which did result was directed at the individual defendants in the case nor does the record so indicate.

Appellants proposed 200 voir dire questions, forty-six of which were rejected by the trial court. (ROA, Vol. 11 at 321 et seq.). It is clear from the voir dire portion of the record that court and counsel

conducted a thorough probe for possible prejudice. (*See*, for example, the comments of defense attorney Brown, ROA, Vol. 19 at 992–993). It is also noted that appellants used only fifteen of their sixteen peremptory challenges. (ROA, Vol. 19 at 957). The scope of examination was more than adequate to select an impartial jury. *See United States v. Hill*, 526 F.2d 1019 (10th Cir.). A sampling of the questions rejected by the court reveals them to be argumentative or cumulative and therefore properly excluded. *United States v. DePugh*, 452 F.2d 915 (10th Cir.); *Brundage v. United States*, 365 F.2d 616 (10th Cir.).

In summary, this case does not present either the massive publicity or the restrictive voir dire which necessitated individual juror examination in *Silverthorne* and other cases relied on by appellants. The trial court handled the voir dire stage properly.

▆ 3. Appellants' third point in relation to the petit jury is unsupportable. These are matters within the discretion of the trial court. *United States v. Braverman*, 522 F.2d 218 (7th Cir.); *United States v. Murray*, 492 F.2d 178 (9th Cir.). Appellants show no prejudice in the matter.

*Alleged Trial Errors:*

Appellants present several points which may be classified as trial errors. These points are as follows:

1. Governmental misconduct.
2. Failure to grant a mistrial in relation to the bomb threat, jury tampering, etc., and, in the alternative, refusing to allow appellants' counsel to conduct an individual examination of the jurors in relation to the incidents.
3. Solitary confinement of the defense witnesses.
4. Improper examination of defense witness Pickens.
5. Improper comment by the court in relation to the disruptive incidents.

The trial court ruled correctly on these issues.

1. The claim of governmental misconduct is aimed not at the government prosecutors but at penitentiary officials. Appellants alleged ten instances of misconduct where prison officials supposedly interfered with the preparation of their defense. *Id.* at 104–106. They argue that they were erroneously denied an evidentiary hearing on their complaints.

Appellants filed a motion to dismiss or in the alternative to extend the trial date (ROA, Vol. I at 233). The motion claimed that penitentiary officials had denied appellants effective assistance of counsel by (1) jailing them in solitary confinement, (2) censoring their mail and hampering the attorney-client relationship, and (3) transferring prisoner witnesses to other institutions. All four appellants filed affidavits in support of the motions. (ROA, Vol. I at 248, 259, 263, 266).

In response to the motion, the government denied that penitentiary officials had denied effective counsel to appellants. (ROA, Vol. I at 269). The government asked the court to take judicial notice of prior criminal cases involving the appellants in which the same points were raised and rejected.

The motions came on for a hearing at the conference on July 15, 1974. (ROA, Vol. 12 at 192). The relevant portion of the discussion is as follows:

"Mr. Brown: . . . I would request that we be allowed to have a full evidentiary hearing on this question. We have raised some very serious allegations.

"The Court: Evidentiary hearing on what?

"Mr. Brown: . . . on our motion for a continuance. I have a whole box full of materials, Judge, which will substantiate, I believe, at least every allegation that was made in our motion for a continuance . . .

"The Court: I don't believe that is a subject of an evidentiary hearing. . ." (ROA, Vol. 12 at 221–222).

There were other exchanges, and the court continued:

"The Court: . . . I've listened to all of the statements, and I think I heard

the same at Leavenworth both times I was there. These are not the only cases we have in the district . . . We don't want to sacrifice anybody's rights on the altar of expediency, and we are not going to do that. But you have all been under notice from about every judge in the district that you are going to trial . . . I've heard nothing here today that changes my mind about the fact, in the case of Mr. Evans, and Mr. Bennett and Mr. Hill and Mr. Jasper should not go to trial on the 29th. . . I know that Mr. Lewis has been working on the case, and there's been interviews, and I had you moved out of the hole so that they, both of you, would be accessible for at least thirty days before trial. That has been done as to both of you. The marshall has been extremely cooperative. *I don't think there's been any deprivation in that regard at all. And, I see no valid reason, really, for continuing these cases. . . .*" (ROA, Vol. 12 at 232–235) (Emphasis added).

 It seems apparent that based upon its experience with the appellants and the nature of the case to that point, the trial court found no factual basis in appellants' claims of deprivation of counsel. This finding is supported by record evidence. (*See,* for example, the Visit Record of appellants, ROA, Vol. I at 273 et seq.).

 The granting of a motion for continuance rests in the discretion of the trial court and the denial thereof will not be set aside absent a clear showing of abuse. *United States v. Earley,* 482 F.2d 53 (10th Cir.); *United States v. Spoonhunter,* 476 F.2d 1050 (10th Cir.); *United States v. Harris,* 441 F.2d 1333 (10th Cir.). Here, there has been no showing, beyond mere conclusory allegations, that appellants were denied effective assistance of counsel.

2. Appellants contend that the trial court erred by refusing to declare a mistrial because of jury tampering, bomb threats, etc., or in the alternative, by refusing to allow defense counsel to individually examine the jurors in relation to the incidents.

The first incident occurred on August 14, 1975, when a juror received a letter signed in the name of appellant Bennett. The court was apprised of the letter by the juror. (ROA, Vol. 27 at 4–5). The court called in all counsel and told them of the incident. He asked counsel for suggestions on how to handle the matter and announced his intention to question the jury himself. No objections were made. The judge then went to the jury room, without counsel, and interrogated the jury as a whole. Later, defense counsel Lewis told the court that defense counsel had wished to be present during the court's examination of the jury. The court responded that he would requestion the jury in open court and attorney Lewis acquiesced in the ruling. In the afternoon, the court examined individually each juror in his chambers outside the presence of counsel. The court then informed counsel of how he had handled the matter, brought the jury in, and again asked them in open court whether the letter had affected their ability to sit on the jury. The jury indicated that they were not influenced by the letter, and trial continued. Appellants' counsel then moved for a mistrial on grounds of governmental misconduct and prejudice resulting from the letters received by the jury. The motion was denied.

The next incident occurred two days later, August 16, 1974, immediately after appellants' opening statements. A bomb threat was received at the court house and was relayed to the court. (ROA, Vol. 28, 87–88). Court recessed for half an hour. When trial resumed, appellant Hill, in front of the jury, blurted out that the court had received a bomb threat. Hill was taken from the court room at his own request and the judge told the jury to disregard the remarks. Appellants again moved for mistrial on grounds that the jury tampering and the bomb threat caused prejudice to the defendants. The motion was again denied.

The third incident occurred on August 29, 1974, when inmate Jack Abbott, a defense witness, assaulted a juror. The trial court noted that Abbott had eyed the jury when he took the stand. After testifying, Abbott

lunged into the jury box and landed in the lap of a juror. Appellants moved for a mistrial because of the incident. The motion was denied.

When court resumed on September 3d, the trial judge, outside the presence of counsel, examined individually each juror about the effect of the Abbott incident. (ROA, Vol. 38 at 4–28). They responded that the incident would not affect their judgment. Court recessed for two days and resumed on September 5th. The court informed counsel that he had previously examined the jurors individually about the Abbott incident. Appellants' motion to voir dire the jury on the incident was overruled. The jury was then brought in. The court instructed them to disregard the disruptive acts which had occurred. The court reporter then read into the record the proceedings held in chambers and the court asked if any of the jurors had changed their mind about being able to disregard the incidents. The jurors responded that they would still act with impartiality. Appellants moved for a mistrial on the grounds that they had not participated in the private examination of the jurors in violation of Rule 43(a), Fed.R. Crim.P. The motion was again denied, and trial resumed.

Appellants raise two points in regard to the disruptive incidents at trial. They first say the trial court erred in failing to declare a mistrial because of the prejudicial effect of the disruptive incidents. Secondly, they argue that the court's procedure of interrogating the jury outside the presence of the defense counsel violated Rule 43(a), Fed.R. Crim.P.

 It is well settled that the grant or denial of a motion for mistrial is within the sound discretion of the trial court. *United States v. Smaldone,* 485 F.2d 1333 (10th Cir.); *United States v. Whitaker,* 435 F.2d 1300 (10th Cir.). When the motion is grounded on the contention that disruptive incidents have prejudiced the jury, the applicable standard is whether " . . . there was an impingement upon the right of the appellant to be tried before a fair and impartial jury." *Rubenstein v. United States,* 227 F.2d 638, 643 (10th Cir.). In *Bailey v. United States,* 410 F.2d 1209 (10th Cir.), appellants alleged that a mistrial should have been granted when the jury was accosted upon leaving the court room by individuals who urged them to free the defendants. This court disagreed, noting that the court had questioned the jury about the incident and that "The results of the trial disclose that the jury discounted the incident and performed its duty free from external pressure." 410 F.2d at 1215.

 That is the case here. The jury was questioned extensively about the effect of the incidents. (On the letter, *see* Vol. 27 at 13–16, 42–58, 71–74; on the bomb threat and the Abbott incident, *see* Vol. 38, at 4–28, Vol. 39 at 11–12, 13–16). They repeatedly responded that the incidents would have no effect on their impartiality. In its discussions with the jury, the court repeatedly stated that the incidents were not to be held against the appellants (*see,* for example, ROA, Vol. 27 at 71). The court also formally instructed the jury to disregard the incidents. (ROA, Vol. 50, Instruction No. 36 at 40). In summary it seems reasonably certain that the jury discounted the incidents and deliberated impartially. The diversity of the verdicts returned by the jury lends support to this conclusion. We do not think that the court abused its discretion by denying the appellants' motion for mistrial.

 Appellants also contend that the trial court violated Rule 43(a), Fed.R. Crim.P., by questioning the jurors about the incidents outside the presence of defense counsel. We find no reversible error. When the threatening letter arrived, the court called counsel and asked for suggestions on how to handle the situation. Counsel had no suggestions and the court informed them that he planned to question them by himself. No one objected, and he did so. Defense counsel Lewis later said that he had wished to be present during the court's questioning. The court responded that he would requestion the jury in open court; attorney Lewis was apparently satisfied. (ROA, Vol. 27 at 5–36). The jury was

then interrogated in open court. There was no independent questioning of the jury relative to the bomb threat. As to the Abbott incident, the court examined the jury by himself. Later, in open court, the transcript of this proceeding was read into the record and the jury was again questioned.

The three incidents upon which motions for mistrial were based were all of a disruptive nature, and had nothing to do with evidence or procedure. They did not involve questions from the jury as to the evidence nor the facts in any way. The incidents are thus quite different from the matters considered in the cases cited by appellants. We find no error in the manner in which the trial judge handled the incidents. What the trial judge did when he met alone with the jury was made part of the record. Thus all the parties had full knowledge as to what the trial court did as to these disruptive incidents. It is apparent that the trial court did all that was possible to see that these outside matters did not influence the jury. There was no "private communication" with the jury as the term is used in the Rules.

In *Bacino v. United States,* 316 F.2d 11 (10th Cir.), a juror made a questionable remark to the court clerk concerning the defendant during trial. The clerk informed the judge who examined the juror outside the presence of the defendant and his counsel. The trial judge then informed counsel what he had done. On appeal of the conviction, appellant contended that the communication violated Rule 43. The court disagreed, noting initially that the communication was probably not covered by the rule:

"The interview of the juror by the judge was a private communication with a juror to admonish him, and only this was done . . . We are not convinced that the statements were 'about the case' in the sense that the rules relating to private communications with jurors use the term, nor within the reasons for which the rules were devised.

. . . . .

". . . It . . . was a matter of the juror's duty as such and of the

court's supervision over the jurors." 316 F.2d at 13–14.

We find no error on this point. As indicated above, there was nothing private about the meetings, and the matters were unrelated to the merits.

3. Appellants contend that the court erred by refusing to enjoin prison officials from holding witnesses who were prisoners in segregated confinement prior to their appearance in court. This point is related to appellants' general claim of governmental misconduct and was raised repeatedly by the defendants. (ROA, Vol. 31 at 17 and Vol. 35 at 4, 100). The primary assertion here is that prison officials harassed and intimidated prisoner witnesses in violation of 18 U.S.C. § 1503.

This claim is without merit. The court conducted an *in camera* examination of Warden Daggett:

"The Court: . . . The claim has been made that currently, that the incoming ones, the witnesses that are being brought in from other places . . . are being immediately put into the hole and given partial rations, and deprived of shoes, and shaving, and the right to have a shower, and made to sleep on the floor, and numerous incidents like that . . . [W]hat I would like to inquire of you, and whoever else might be in charge, is as to whether they were treated any differently?

"Mr. Daggett: They are not treated any differently than anyone else . .

. . . . .

"Mr. Daggett: We put them in Phase One [segregation] because that is downstairs, because that is the only place we had space. And, the cells are the same. It's a matter of location, and nothing else. The cells are the same. The beds are the same, and the food is the same. There's no difference whatsoever." (ROA, Vol. 32 at 31–39).

It is apparent that the prisoner witnesses were accommodated in the prison in a manner most practically consistent with the cir-

cumstances of the case. Claims of harassment and intimidation are without factual support.

4. Appellants argue the court erred in certain rulings concerning the examination of defense witness Pickens. Pickens testified as a character witness for appellant Bennett:

"Mr. Lewis: Mr. Pickens, you are aware of, are you not, of Mr. Bennett's reputation for being a peaceful and law-abiding citizen?

"Mr. Pickens: Yes, sir, I am.

"Mr. Lewis: And, is he, in fact, a peaceful and lawabiding citizen?

"Mr. Pickens: He is.

"Mr. Lewis: Is he a man prone to violence?

"Mr. Pickens: No. No.

"Mr. Lewis: What about his reputation for truth and veracity?

"Mr. Pickens: He is a very truthful brother." (ROA, Vol. 28 at 122).

On cross-examination, Pickens was asked if he had heard that Bennett had been convicted of various crimes. (ROA, Vol. 29 at 41 et seq.). The prosecution then began asking if Pickens had heard that Bennett had been *arrested* for various crimes:

"Mr. Miller: Mr. Pickens, have you heard Mr. Odell Bennett being arrested for malicious mischief in Memphis, Tennessee.

"Mr. Lewis: I'm going to object your honor, as improper, in terms of arrest. It should be in terms of conviction. . ." (ROA, Vol. 29 at 43).

The court eventually overruled the objection and allowed the prosecution to continue asking Pickens whether he had heard that Bennett had been arrested for various crimes. (ROA, Vol. 29 at 61 et seq.). On redirect examination, defense attorney Lewis attempted to ascertain whether Pickens had heard the dispositions of the arrests:

"Mr. Lewis: Mr. Pickens, did you hear the charge alluded to by Mr. Miller, namely an arrest of Odell Bennett . .

for malicious mischief that he was fined $26?" (ROA, Vol. 29 at 112).

The prosecution objected on grounds that disposition of the charge was irrelevant in the examination of a character witness. (ROA, Vol. 29 at 112–120). The court sustained the motion and attorney Lewis was not allowed to inquire into the dispositions of the arrest charges.

Appellants argue that witness Pickens should not have been asked if he had heard of Bennett's *arrests* and, in the alternative, that the disposition of the arrests was a proper topic for redirect examination. There is no merit to these arguments.

The issue is governed by *Michelson v. United States,* 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168. That case makes clear that the purpose of cross-examination of a character witness is not to establish the truth of the acts inquired about but rather to show the existence of such acts as they may bear upon the credibility of the witness and the accuracy of his testimony regarding community opinion. Thus, a character witness may be asked whether he has heard that the defendant has been arrested for a crime whether or not it culminated in a conviction. 335 U.S. at 482, 69 S.Ct. 213.

Here, the court was satisfied that there was a sufficient underlying basis for the questions asked by the prosecution. (*See* ROA, Vol. 29 at 55–56). *United States v. Parker,* 469 F.2d 884 (10th Cir.). Additionally, the court gave a detailed limiting instruction on the purpose and effect of Picken's testimony. (ROA, Vol. 50, Instruction No. 33 at 43–45). There is no error in the trial court's ruling relative to the testimony of witness Pickens.

5. Appellants also contend that they were prejudiced by the court's comments on numerous occasions that "someone was trying to wreck the trial." Appellants argue that there was no evidence to support these statements. This point is meritless.

The record speaks for itself. The mysterious letter, the bomb scare, and the Abbott

incident provided clear indication that someone was in fact attempting to obstruct the trial. The trial judge was merely stating the obvious. However, the court was meticulous in reminding the jurors that the incidents were not to be held against the defendants. Instruction No. 36 (ROA, Vol. 50 at 40–41) summarizes the court's position on the issue:

"... As I said to you on the day of its occurrence, and on subsequent times and previously, at the initial questioning of prospective jurors on void dire and at various other times when disruptive acts have occurred, you must wipe these incidents from your minds insofar as they concern giving a fair trial to all the parties in this case."

There is not even the hint of impropriety in any of the court's comments to the jury.

*Alleged Error in the Court's Instructions:*

■ Appellants contend the trial court erred in various instructions. Throughout this discussion it is noted that the sufficiency of instructions is not determined by the giving or failing to give particular instructions, but rather by viewing all instructions as a whole. *Young v. Anderson,* 513 F.2d 969 (10th Cir.); *United States v. Smaldone, supra.* Appellants raise the following issues:

1. The court erred by including the word "connive" in instructions 4, 5, and 6.
2. The court erred in its definition of "riot" in instructions 6, 7, and 8.
3. Instruction 9 was improper.
4. Instructions 27, 28, and 29 concerning "what this case is not about" were irrelevant and prejudicial.

We find no error in the court's instructions.

1. The court used the word "connive" in outlining the elements of 18 U.S.C. § 1792 (ROA, Vol. 50, Instructions 4, 5, and 6, at 14–16). Appellants argue, somehow, that this was error since the government had "abandoned its conspiracy allegation." There is no error here.

■ The court defined the offense in statutory language which, in the absence of ambiguous language, is permissible. *Kitchens v. United States,* 272 F.2d 757 (10th Cir.). Additionally, the court provided specific instruction on the meaning of the various statutory terms. (*See* ROA, Vol. 50 at 15–16).

■ 2. The court's instruction on the definition of "riot" was also adequate:

"[A] 'riot' is a tumultuous disturbance of the peace by three persons or more, assembling together of their own authority, with an intent mutually to assist each other against any who shall oppose them, in the execution of some unlawful enterprise of a private nature, and afterwards actually executing the same in a violent and turbulent manner." (ROA, Vol. 50, Instruction 6 at 15).

This definition contains the concept of "immediate power of execution" sought by appellant. It is sufficient.

■ 3. Instruction No. 9, ROA, Vol. 50 at 17–18, provides:

"Evidence has been permitted to come before you in this trial which would indicate that several disturbances occurred at various places, i. e., the dining room, laundry room, Cellhouse 'A', and perhaps other places in the United States Penitentiary at Leavenworth, Kansas, at or near the time of the events covered by the indictment in this case. Further, such evidence may have indicated a disturbance at time prior to the events in Cellhouse 'A'.

"Under the law governing this case, it will not be necessary for the jury to determine where in the prison a disturbance began or even ripened into a riot ... or whether one disturbance preceded another in time sequence.

"In judging the guilt or innocence of the defendants, ... the jury will look at the conduct and words of any particular defendant in determining whether a particular defendant instigated, connived, attempted to cause, or as-

sisted to cause a riot, wherever it may have occurred . . ."

There is no error in this instruction.

 4. Instructions 27, 28, and 29, ROA, Vol. 50 at 33–37, did indeed instruct the jury on "what this case is not about." Throughout the trial the appellants proposed the argument that their unlawful behavior was justified by the conditions existing at the prison. The court properly pointed out in these instructions that prison conditions, whatever they might have been, did not justify the criminal conduct of the appellants. Prison conditions do not justify a riot. *See Conte v. Cardwell,* 475 F.2d 698 (6th Cir.), *cert. denied,* 414 U.S. 873, 94 S.Ct. 134, 38 L.Ed.2d 91; *United States v. Haley,* 417 F.2d 625 (4th Cir.); *see also Nelson v. United States,* 208 F.2d 211 (10th Cir.). There is no error in these instructions, especially in light of appellants' references to prison conditions.

We find no error, and the judgment of the trial court as to each appellant is AFFIRMED.